**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES -- GENERAL**

| | |
|---|---|
| Case No.   **CV 22-6909-JFW(PVCx)** | Date:  January 25, 2023 |

Title:      Alison White -v- Ring LLC, et al.

---

**PRESENT:**

**HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

| | |
|---|---|
| Shannon Reilly | None Present |
| Courtroom Deputy | Court Reporter |

| | |
|---|---|
| **ATTORNEYS PRESENT FOR PLAINTIFFS:** | **ATTORNEYS PRESENT FOR DEFENDANTS:** |
| None | None |

PROCEEDINGS (IN CHAMBERS):    ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION, OR IN THE ALTERNATIVE, TO DISMISS THE SECOND AMENDED COMPLAINT [filed 12/23/22; Docket No. 61]

On December 23, 2022, Defendants Ring LLC ("Ring") and Home Depot U.S.A., Inc. ("Home Depot") (collectively, "Defendants") filed a Motion to Compel Arbitration, or in the Alternative, to Dismiss the Second Amended Complaint ("Motion").  On December 30, 2022, Plaintiff Alison White ("White") filed her Opposition.  On January 9, 2023, Defendants filed a Reply.  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found the matter appropriate for submission on the papers without oral argument.  The matter was, therefore, removed from the Court's January 23, 2023 hearing calendar and the parties were given advance notice.  After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

I.      **Factual and Procedural Background**

    A.      **White's Allegations**

White is a licensed attorney and real estate broker, who buys, renovates, and sells homes through her companies, Alison White Homes LLC and Blu and White Homes LLC.  Ring manufactures and sells home security devices, including a Jobsite Security Kit (the "Jobsite Kit"), which is a "flexible security system for contractors" designed for homes under construction.  Ring also offers optional "Protect Plans" that provide additional features for Ring devices for a fee.  As Ring's webpage for the Jobsite Kit explains, Protect Pro, when used with a Jobsite Kit, provides a "One-Touch Emergency Response with SOS" that allows customers to "[i]nstantly request police, fire or medical services with the Ring App."  As part of this feature, when a customer alerts Ring

that "there's an issue, we'll call authorities and resolve it for you."  This customer-initiated feature is available "around the clock," or "24/7."

     According to Plaintiff, she purchased her first Jobsite Kit from Home Depot's (the exclusive seller of the Jobsite Kit at the time) website on December 5, 2021, and purchased a Protect Pro subscription for her Jobsite Kit through the Ring website on December 6, 2021.  On December 11, 2021, Plaintiff purchased her second Jobsite Kit from Home Depot's website, and purchased a Protect Pro subscription for her Jobsite Kit through the Ring website on December 14, 2021.  On December 21, 2021, Plaintiff purchased her third Jobsite Kit online from Home Depot's website, and purchased a Protect Pro subscription for her Jobsite Kit through the Ring website on December 23, 2021.

     On December 24, 2021, White installed a Jobsite Kit at one of her residential "jobsite" construction locations in Los Angeles.  According to White, one of the "alarms" on that Jobsite Kit was triggered on December 25, 2021, which is when she purportedly discovered that Ring does not automatically call the authorities without her making such request through the mobile application.  SAC, ¶¶ 48-49.

     White's claims against Ring and Home Depot are premised on her belief that Ring falsely represented that when she purchased the Jobsite Kit and a Protect Pro subscription, Ring would "automatically" call authorities if the Jobsite Kit "alarm" was "triggered."[1]  Specifically, White alleges she "relied upon Defendants' representation that their Jobsite Security Kit with the Pro Subscription would *automatically* contact authorities if triggered while the alarm was set."  SAC, ¶ 53 (emphasis added); *see also* SAC, ¶ 20.  In support of her claim, White cites to Ring's Jobsite Kit webpage, which states "[w]e'll handle it.  If there's an issue, we'll call authorities and resolve it for you when you enroll in 24/7 professional monitoring."  SAC, ¶ 11.  White alleges that she "believed" this statement meant that Ring "would automatically contact authorities if [the Jobsite Kit was] triggered."  SAC, ¶ 53.

### B.    White's Arbitration Agreements with Ring

     Ring provides its products and services to customers pursuant to a contractual "Terms of Service," which includes a mandatory arbitration agreement.  Ring customers must download the Ring app and create a Ring account to set up and manage Ring devices, including the Jobsite Kit and a Protect Pro subscription.

     To purchase a Protect Pro subscription, customers are required to visit a page that prominently states in the center: "By proceeding, you agree to Ring Terms of Service."  The underscored blue text is a hyperlink to the referenced Terms of Service located at

---

[1]  Ring also sells a different type of security system, the "Ring Alarm home security system," for in-home use.  In connection with the "Ring Alarm home security system," customers who have a Protect Pro subscription can access a professional monitoring feature that is specific to those devices.  SAC, Exh. A.  When that feature is activated, and "alarm sensors" for the Ring Alarm home security system are triggered, Ring will contact the customer, and if the customer "confirm[s] or can't answer, [Ring] can request emergency response to [the customer's home]."  SAC, Exh. A.

www.ring.com/terms.  In order to complete the transaction, the customer must click a "Purchase" button at the bottom right of the screen, and immediately to the left of the "Purchase" button, the page again advises: "By continuing, you agree to Ring's Terms of Service."  As a result, by clicking the "Purchase" button, a customer affirmatively accepts Ring's Terms of Service, including the arbitration agreement.

Similarly, when activating the professional monitoring feature through Protect Pro, customers must proceed through a page that specifically states, "please take a moment to review the Terms and Conditions.  Tap **I Agree** to accept these terms for both professionally monitored and self-monitored Ring Alarms."  The blue font denotes a hyperlink that navigates the customer to the Ring Terms of Service for review.  The customer must press the "I Agree" button to proceed and enroll.  As a result, by clicking the I Agree button, a customer affirmatively accepts Ring's Terms of Service, including the arbitration agreement.

The Ring Terms of Service that White accepted prominently state at the top in all capital typeface: "IMPORTANT NOTICE: THIS AGREEMENT IS SUBJECT TO BINDING ARBITRATION . . . AS DETAILED IN THE DISPUTE RESOLUTION SECTION."  The first paragraph also states: "Please read these Terms closely because they contain important information about automatic renewal, a class action waiver, and an arbitration provision, requiring you to arbitrate any claims you may have against Ring on an individual basis."  The blue text in these statements are hyperlinks, which navigate the customer directly to the arbitration agreement for review.  By accepting Ring's Terms, White agreed that "ANY DISPUTE, CONTROVERSY, OR CLAIM ARISING OUT OF, OR RELATING TO . . . USE OF [RING'S] SERVICES AND/OR PRODUCTS, TO THIS AGREEMENT, OR TO THE CONTENT, [OR] ANY RELATIONSHIP BETWEEN [THE PARTIES] . . . SHALL BE RESOLVED ONLY BY FINAL AND BINDING, BILATERAL ARBITRATION."  The arbitration agreement defines "Disputes" to include "claims . . . you bring against our employees, agents, affiliates, or other representatives."  Disputes must be resolved on an individual basis, but the arbitrator "can award on an individual basis the same damages and relief as a court (including injunctive and declaratory relief or statutory damages)."  The Ring Terms of Service also specifically states that any arbitration "shall . . . be administered by the Judicial Arbitration and Mediation Services, Inc. ('JAMS'), pursuant to the JAMS Streamlined Arbitration Rules & Procedures."

   C.  **White's Arbitration Agreements with Home Depot**

White opened a Home Depot account in 2016, and since then has made numerous purchases through Home Depot's website.  Since at least 2019, Home Depot's website has required every customer to create an account and log in to their existing account before they can make any online purchases.  Home Depot offers two types of accounts – one for personal purposes, and another for business purposes called "Pro Xtra."  For the Pro Xtra account, a customer must sign in to their account by first entering their email address, and then they are brought to the password entry page.  The customer must then input their password and click "Sign In" to proceed and make a purchase.  Directly below the Sign In button, customers are advised: "By selecting `Sign In' you are agreeing to the Pro Xtra Terms and Conditions . . . "  The blue terms hyperlink to the Pro Xtra Terms and Conditions on Home Depot's website, providing the customer an opportunity to review and decide whether to accept the Pro Xtra Terms and Conditions before clicking "Sign In."

White has a Home Depot Pro Xtra account, and she used her Home Depot Pro Xtra account to purchase the Jobsite Kits at issue on December 5, 11, and 21, 2021. For each of those purchases, White signed in and accepted the Pro Xtra Terms and Conditions. Since making those purchases, White has continued to log in to her Pro Xtra account and has made additional online purchases – at least seventeen purchases from March 2021 to September 2022, repeatedly accepting the Pro Xtra Terms and Conditions. In accepting the Pro Xtra Terms and Conditions, White has agreed that "any claim, dispute or controversy arising out of, relating to or concerning in any way the [Pro Xtra] Program or these Program Rules shall be resolved by binding arbitration administered by the American Arbitration Association ("AAA") under its commercial arbitration rules."

### D. Procedural History

On September 23, 2022, Plaintiff, on behalf of herself and all others similarly situated, filed a Class Action Complaint against Ring, Home Depot, and Amazon.com Services LLC, d/b/a Amazon.com, Inc. ("Amazon"). On November 21, 2022, Plaintiff filed a First Amended Class Action Complaint. On November 29, 2022, Plaintiff and Amazon stipulated to Amazon's dismissal without prejudice from this action. On December 13, 2022, Plaintiff filed a SAC, alleging causes of action for: (1) violation of the Consumer Legal Remedies Act, California Civil Code §§ 1750, *et seq.*; (2) violation of the False Advertising Law, California Business & Professions Code §§ 17500, *et seq.*; (3) violation of the Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq.*; (4) negligent misrepresentation; (5) intentional misrepresentation; and (6) breach of express warranty, California Commerce Code §§ 2313, *et seq.*

## II. Legal Standard

In 1925, Congress enacted the Federal Arbitration Act ("FAA") in response to widespread judicial hostility to arbitration. *See American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304, 2308-09 (2013); *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011). Section 2 of the FAA provides in relevant part:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

This provision reflects both a "liberal federal policy favoring arbitration" and the "fundamental principle that arbitration is a matter of contract." *Concepcion*, 131 S. Ct. at 1745 (quotations and citations omitted). "In line with these principles, courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." *Id.* (internal citations omitted).

"A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may petition the district court for an order compelling arbitration "in the manner provided for in such an agreement." 9 U.S.C. § 4. In addition, a party to a lawsuit

pending in federal court may request that the court stay the court proceedings pending the outcome of the arbitration proceedings. 9 U.S.C. § 3; *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1048 (9th Cir. 1996). The Court, "upon being satisfied that the making of the agreement for arbitration . . . is not in issue . . . shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. By its terms, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Chiron Corp. v. Ortho Diagnostic Systems, Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985)).

Generally, "the [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). However, certain issues are presumptively reserved for the Court. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002). These issues include "gateway" questions of arbitrability, such as "whether the parties have a valid arbitration agreement or are bound by a given arbitration clause, and whether an arbitration clause in a concededly binding contract applies to a given controversy." *Momot v. Mastro*, 652 F.3d 982, 987 (9th Cir. 2011). However, parties may delegate the adjudication of gateway issues to the arbitrator if they "clearly and unmistakably" have agreed to do so. *Howsam*, 537 U.S. at 83 (citation omitted). "When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019).

### III. Discussion

In their Motion, Defendants move to compel arbitration of all of White's claims pursuant to the arbitration agreements, including the delegation clauses contained in the Ring Terms of Service and the Home Depot Pro Xtra Terms and Conditions.[2] White does not dispute that the Ring Terms of Service or the Home Depot Pro Xtra Terms and Conditions contain arbitration agreements. Instead, White argues that she neither consented to nor had any constructive knowledge of the arbitration agreements because those arbitration agreements are contained in unenforceable browsewrap agreements that did not require White to click on and consent to them. In addition, White argues that both arbitration agreements are unenforceable because they are procedurally and substantively unconscionable.

    **A.    White Consented to the Ring Terms of Service and the Home Depot Pro Xtra Terms and Conditions and Her Consent is Binding**

"When deciding whether the parties agreed to arbitrate … [courts] apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S.

---

[2] In the alternative, if the Court does not grant the motion to compel arbitration, Defendants move pursuant to Rule 12(b)(1), 12(b)(6), and 9(b) to dismiss the SAC with prejudice because White failed to state a claim upon which relief can be granted. Because the Court grants the motion to compel arbitration, the Court need not address Defendants' motion to dismiss.

938, 944 (1995). In this case, California law applies under the Ring Terms of Service and Georgia law applies under the Home Depot Pro Xtra Terms and Conditions. Under both California and Georgia law, "[t]o form a contract, a manifestation of mutual assent is necessary." *Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850 (1999); *Fritz v. Fed. Warranty Ser. Corp.*, 516 F. Supp. 3d 1358, 1367 (N.D. Ga. 2021) ("Georgia law requires the assent of both parties in order to form a contract."). "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties." *HM DG, Inc. v. Amini*, 219 Cal. App. 4th 1100, 1109 (2013); *Fritz*, 516 F. Supp. 3d at 1367 ("In Georgia, the standard for ascertaining whether there was mutual assent is an objective one").

With respect to agreements entered into online, courts have found that "browsewrap" agreements are unenforceable, but that "clickwrap" agreements and "modified clickwrap" (or "browsewrap-that-resembles-clickwrap" or "sign-up wrap") agreements are enforceable. *In re Ring LLC Privacy Litig.*, 2021 WL 2621197, at *5 (C.D. Cal. June 24, 2021) (holding that the consumer accepted the arbitration agreement in the Ring Terms of Service by creating an account where "the user is provided with an opportunity to review the terms . . . in the form of a hyperlink immediately above or below a button that must be clicked to affirmatively acknowledge the terms, place an order, or register for an account"); *Rodriguez v. Experian Servs. Cop.*, 2015 WL 12656919, at *1–2 (C.D. Cal. Oct. 5, 2015) (finding assent to arbitration agreement where "website contained a hyperlink to the Terms of Use at the bottom of every page and included an express disclosure and acknowledgment, which stated, 'By clicking the button above . . . you agree to our Terms of Use'"); *Gallivan v. Educ. Mgmt. Corp.*, 2017 WL 7663068, at *4–7 (N.D. Ga. Aug. 16, 2017) (holding that the plaintiff consented to the arbitration agreement where the plaintiff clicked a "next" button under a note that "by clicking below, I agree to abide by the terms"); *Person v. Lyft, Inc.*, 2020 WL 5639804, at *1 (N.D. Ga. Sept. 9, 2020) (finding consent where the plaintiff "clicked the box next to 'I agree to Lyft's Terms of Service,' [which were hyperlinked], and then clicked 'NEXT'"). Courts have concluded that browsewrap agreements are not enforceable because "a browsewrap agreement does not require the user to manifest assent to the terms and conditions expressly" because a party "instead gives his assent simply by using the website." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014) ("Thus, by visiting the website – something that the user has already done – the user agrees to the Terms of Use") (citation and internal quotation marks omitted). Clickwrap agreements require a user to manifest assent to the terms and conditions presented because "website users . . . click on an 'I agree' box after being presented with a list of terms and conditions of use." *Id.* Similarly, "modified clickwrap" agreements require a user to manifest assent to the terms and conditions presented because "the user is provided with an opportunity to review the terms of service in the form of a hyperlink immediately above or below a button that must be clicked to affirmatively acknowledge the terms, place an order, or register for an account." *In re Ring LLC Priv. Litig.*, 2021 WL 2621197, at *5.

In this case, White admits that she purchased a Protect Pro subscription on Ring's website for each of her Jobsite Kits and "activated the Monitoring settings [using] her Ring smartphone application." *See* SAC, ¶¶ 43–46. In addition, White admits that she purchased the Jobsite Kits through the Home Depot website. SAC, ¶ 38. Specifically, when purchasing a Protect Pro subscription for each of her three Jobsite Kits, White accepted Ring's Terms of Service by clicking the "Purchase" button. White was informed that she was accepting Ring's Terms of Service by clicking the "Purchase" button because immediately to the left of the "Purchase" button, White was informed that "[b]y continuing, you agree to Ring's Terms of Service," and there was a hyperlink to

Ring's Terms of Service for her review.  In addition, when White activated the monitoring settings via the Ring mobile application for each of her three Jobsite Kits, she was advised each time to "please take a moment to review the Terms and Conditions," which hyperlinked to Ring's Terms of Service for her review, and "Tap **I Agree** to accept these terms," which she accepted to complete her enrollment.  As a result, the Court concludes that the Ring Terms of Service were presented to White as a fully enforceable modified clickwrap agreement and that by purchasing a Protect Pro subscription on Ring's website and activating the monitoring settings via the Ring mobile application, White affirmatively accepted Ring's Terms of Service, including the arbitration agreement.

Similarly, the Court concludes that the Home Depot Pro Xtra Terms and Conditions were presented to White as a fully enforceable modified clickwrap agreement and that White affirmatively accepted the Home Depot Pro Xtra Terms and Conditions, including the arbitration agreement.  Specifically, White signed in to her Home Depot account before purchasing her three Jobsite Kits.  White was immediately advised, directly below the "Sign In" button, that by clicking the "Sign In" button, she was "agreeing to the Pro Xtra Terms and Conditions."  The blue term hyperlinks to the Pro Xtra Terms and Conditions on the Home Depot website provided White with ample opportunity to review those terms, including the arbitration agreement, before deciding to proceed.

Moreover, although White argues that she was not "aware" of the arbitration agreements in the Ring Terms of Service or the Home Depot Pro Xtra Terms and Conditions because she did not review either the Ring Terms of Service or the Home Depot Pro Xtra Terms and Conditions, it is well established that "[i]t is of no consequence whether a consumer actually clicks a hyperlink to read the terms containing the arbitration provision or not."  *See, e.g.,S.S. by and through Stren v. Peleton Interactive, Inc.*, 566 F.Supp. 3d 1019 (S.D. Cal. 2021); *Maynez v. Walmart, Inc.*, 479 F. Supp. 3d 890, 896 (C.D. Cal. 2020) (holding that hybrid clickwrap gave constructive notice, despite the plaintiff's claim she was "never aware" of the arbitration agreement and "never understood" she was agreeing to arbitrate); *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 908 (N.D. Cal. 2011) (enforcing hybrid clickwrap despite "no record of whether Plaintiff or anyone else ever clicked on the blue hyperlinked . . . Terms").

Accordingly, the Court concludes that White agreed to the Ring Terms of Service and the Home Depot Pro Xtra Terms and Conditions, which included the respective arbitration agreements.

### B.   Issues of Arbitrability Were Delegated to the Arbitrator

If an arbitration agreement delegates arbitrability issues to the arbitrator, that delegation obviates the need for a court to consider any arguments regarding the enforceability or scope of the arbitration agreement.  *See Gerlach v. Tickmark Inc.*, 2021 WL 3191692, at *5 (N.D. Cal. July 28, 2021) (holding that "whether the arbitration agreement is valid and whether this dispute falls within its scope are questions for the arbitrator, not this Court, to decide").  If a court determines "a valid [arbitration] agreement exists [that] delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue" and must compel arbitrability to the arbitrator.  *Henry Schein*, 139 S. Ct. at 530.  An agreement "clearly and unmistakably" delegates arbitrability to the arbitrator when it incorporates arbitration rules that give the arbitrator authority to decide arbitrability, like the

AAA or JAMS rules.  *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (holding that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability"); *see also Ramirez v. Elec. Arts*, 2021 WL 843184, *4 (N.D. Cal. Mar. 5, 2021) (enforcing delegation clause in AAA Commercial Rules); *Chaine v. Tesla Energy Ops., Inc.*, 2021 WL 4932733, at *4 (C.D. Cal. Apr. 8, 2021) (holding that incorporation of the JAMS Rules constitutes clear and unmistakable evidence that the contracting parties agreed to arbitrate arbitrability).

      In this case, it is undisputed that the arbitration agreement in the Ring Terms of Service specifically states that any arbitration "shall . . .  be administered by the Judicial Arbitration and Mediation Services, Inc. ('JAMS'), pursuant to the JAMS Streamlined Arbitration Rules & Procedures."  Rule 8(b) of the JAMS Streamlined Arbitration Rules & Procedures states that:

> Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator.  The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.[3]

In addition, the Ring Terms of Service include an express delegation clause providing that "the arbitrator . . . shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of these Terms, including, but not limited to any claim that all or any part of these Terms are void or voidable, or whether a claim is subject to arbitration."  It is also undisputed that the arbitration agreement in the Home Depot Pro Xtra Terms and Conditions specifically states that: "any claim, dispute or controversy arising out of, relating to or concerning in any way the Program or these Program Rules shall be resolved by binding arbitration administered by the American Arbitration Association ('AAA') under its commercial arbitration rules."  Rule 7(a) of the AAA Commercial Arbitration Rules states that:

> The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.

      Accordingly, the Court concludes that under both the Ring Terms of Service and the Home Depot Pro Xtra Terms and Conditions, the parties "clearly and unmistakably" agreed that the arbitrator would decide issues of arbitrability, including whether the respective arbitration agreements are enforceable and whether White's claims fall within its scope of the respective arbitration agreements and, as a result, the Court need not, and should not, determine those issues.[4]

---

   [3]  Because the issue of who is a proper party to the arbitration is an issue delegated to the arbitrator, the Court concludes that the arbitrator should decide if Home Depot may enforce the arbitration agreement in the Ring Terms of Service as a third party beneficiary.

   [4]  White challenges both arbitration agreements as unconscionable.  However, because White has made an unconscionability challenge to the entire arbitration agreement in the Ring

### IV.  Conclusion

For all the foregoing reasons, Defendants' Motion is **GRANTED**.  This action is **STAYED** pending the outcome of the arbitration.[5]

IT IS SO ORDERED.

---

Terms of Service and the Home Depot Pro Xtra Terms and Conditions, and not specifically challenged the delegation clauses as unconscionable, the Court concludes that White's unconscionability challenges must be heard by the arbitrator.  *See Rent–A–Center,* 561 U.S. at 75 (declining to consider respondent's claim that the entire agreement to arbitrate was unconscionable because it was not specific to the delegation clause); *Mohamed v. Uber Technologies, Inc.*, 848 F.3d 1201, 1210 (9th Cir. 2016) ("When considering an unconsionability challenge to a delegation provision, the court must consider only arguments 'specific to the delegation provision").  In addition, to the extent White has made a specific argument regarding the unconscionability of either delegation clause, the Court concludes that White has failed to meet her burden of demonstrating unconscionability.

[5]  Defendants argue that because White's claims are subject to arbitration, dismissal of this action is proper.  However, because the Court did not reached the gateway questions of arbitrability and, instead, found that those questions are delegated to the arbitrator, the Court concludes that dismissal of this action "at this juncture would be inappropriate."  *See, e.g., Gerlach v. Tickmark*, 2021 WL 3191692 (N.D. Cal. July 28, 2021) (concluding that dismissal of action was inappropriate where the issues of arbitrability had been delegated to the arbitrator); *Ramirez v. Electronic Arts Inc.*, 2021 WL 843184 (N.D. Cal. Mar. 5, 2021) ("Although the parties do not contest that Ramirez's claims are covered by the Arbitration Provision, the arbitrator must still determine as an initial matter whether the Arbitration Provision is enforceable against Ramirez's claims.  Because it is not certain that Ramirez's claims will remain in arbitration, outright dismissal is not appropriate, and the Court stays this action pending the completion of arbitration").